930 F.2d 170
 59 USLW 2625, 33 Soc.Sec.Rep.Ser. 152,
Medicare&Medicaid Gu 39,202
 KELLY KARE, LTD., Joan C. Kelly, Kevin McNulla, on Behalf of
Himself and All Others Similarly Situated, and Charlotte
Cohen, on Behalf of Herself and All Others Similarly
Situated, Plaintiffs-Appellants,
v.
Andrew P. O'ROURKE, Westchester County Executive,
Westchester County, Westchester County Department of Social
Services, John J. Allen, or His Successor, Commissioner of
the Westchester County Department of Social Services
("WCDSS"), S. Reitano, First Deputy Commissioner WCDSS,
Phyllis Shearer, Deputy Commissioner, WCDSS, Joseph J.
Campanella, Program Coordinator of WCDSS, Patricia Quirk,
Supervising Examiner WCDSS, Adrienne Young, Program
Coordinator of WCDSS, Ms. Califano, WCDSS Supervisor, Cindy
Capone, WCDSS Personal Care Worker, Donald Williams, WCDSS
Caseworker, Defendants-Appellees.
 No. 1106, Docket 90-9107.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 9, 1991.
Decided April 5, 1991.
 
 James S. Frank (Vedder, Price, Kaufman, Kammholz & Day, New York City, Michael W. Sculnick and Neil A. Capobianco, of counsel) for plaintiffs-appellants.
 Frank Marocco (Westchester County Attorney's Office, White Plains, N.Y., Marilyn J. Slaaten, Westchester County Atty., and Carol L. Van Scoyoc, Deputy County Atty., Westchester County, of counsel) for defendants-appellees.
 Before WINTER, ALTIMARI and McLAUGHLIN, Circuit Judges.
 McLAUGHLIN, Circuit Judge:
 
 
 1
 The Westchester County Department of Social Services ("WCDSS") decided--without giving any reason--to terminate the Medicaid reimbursement contract of plaintiff Kelly Kare, Ltd. ("Kelly Kare"), a provider of health-care services to individuals who require medical assistance in their homes. Kelly Kare assails this as an unconstitutional deprivation of property and liberty because it limits Kelly Kare's status as a qualified Medicaid provider and because it stains Kelly Kare's professional reputation, without due process. Because it is clear that plaintiffs were afforded no process by WCDSS, we are squarely confronted with the issue of whether a provider of Medicaid-sponsored health-care services has a right to continued and uninterrupted participation in the Medicaid program.
 
 BACKGROUND
 
 2
 Medicaid is a medical assistance program created by Titles XIX and XX of the federal Social Security Act to provide indigents and the disabled with subsidized medical care. 42 U.S.C. Sec. 1396 et seq. (1988). Although funding comes primarily from the federal government, it also comes from the individual states and, to a lesser degree, from municipalities and counties. Congress has delegated the authority to administer the Medicaid program to the states. As such, the states are responsible for licensing health-care providers and qualifying them for participation in the program.
 
 
 3
 The day-to-day administration of the Medicaid program is performed by local social services districts. Each district has the option to render the services directly or to contract with a qualified provider of Medicaid services to furnish the necessary medical assistance. N.Y.Soc.Serv.Law Sec. 365(1)(d). If a district chooses the second alternative, the chosen provider is then entitled to be reimbursed for the legitimate health-care services that it renders to Medicaid-eligible patients.
 
 
 4
 Westchester County, a local social services district, has opted to provide Medicaid services through contracts with qualified providers. Kelly Kare, a qualified provider of home health care, renders housekeeping and other personal-care services.
 
 
 5
 In 1987, Kelly Kare entered into the first of a series of one-year contracts with WCDSS for reimbursement of Medicaid services. From year to year, the only salient difference in the contracts was the rate at which the providers would be reimbursed. The County's health-care providers would gather annually where WCDSS presented them with the proposed rate schedule for the following year. Once the providers assented to the proposed rates, the contracts were sent off to WCDSS for approval.
 
 
 6
 At his deposition, John Allen, Commissioner of WCDSS, testified that if health-care providers agreed to the proposed rate schedules and kept their "filings" up to date--e.g., liability insurance, references, insurance coverage for their workers--they were usually awarded a new contract. Nothing in the record, however, indicates that simply because a party acceded to the proposed rates it became entitled to a contract with the County. In fact, the record establishes that several further steps had to be executed for the contract to become binding.
 
 
 7
 One clause in the reimbursement contract provides that the contract is terminable, without cause, upon thirty days' notice. This clause is authorized by a regulation of the New York State Department of Social Services, which states:
 
 
 8
 A provider's participation in the program may be terminated by either the provider or the department upon thirty days' written notice to the other without cause.
 
 
 9
 18 N.Y.C.R.R. Sec. 504.7(a). Neither the contract clause nor section 504.7(a) affords a hearing to the terminated provider.
 
 
 10
 On October 26, 1990, WCDSS invoked this contractual option and informed Kelly Kare that the 1990 reimbursement contract would be cancelled, without cause, effective November 30, 1990. Defendants then began informing Kelly Kare's patients and employees that the contract had been terminated and that, after November 30, 1990, Kelly Kare would no longer be reimbursed for any Medicaid-related services it rendered.
 
 
 11
 Defendants' decision to terminate Kelly Kare's contract was reached soon after Kelly Kare had agreed to the proposed rate schedule for 1991. Defendant Joseph Campanella, Program Coordinator for WCDSS, requested proof from Kelly Kare that its employees were covered by a health-insurance plan. The record indicates that this was not the first request made for such information. Apparently, Joan Kelly, president of Kelly Kare, had been delinquent in providing this information in the past. Nevertheless, on September 16, 1990, Ms. Kelly visited Mr. Campanella's office and handed him a copy of a collective-bargaining agreement that had recently been negotiated between Kelly Kare and its employees. The agreement contained an employee health-insurance clause. Mr. Campanella told Ms. Kelly that he was unfamiliar with this type of agreement and that he would pass it along to the "legal department" to assure that Kelly Kare's employees were being afforded proper coverage. Just over one month later, Kelly Kare was informed that its Medicaid contract was being terminated, without cause. This, claims Kelly Kare, demonstrates that anti-union animus impermissibly motivated WCDSS to cancel the contract.
 
 
 12
 Upon commencement of this action, plaintiffs moved to enjoin defendants from terminating the contract without cause. Kelly Kare argued, as it does now, that New York's Social Services Law creates a property interest in those health-care providers that the state deems qualified to participate in the Medicaid program. See N.Y.Soc.Serv.Law Sec. 364(2)(b). As such, Kelly Kare asserted that it was entitled to due process prior to being terminated from participation in Medicaid. Additionally, Kelly Kare contended that the without-cause termination stigmatized its reputation, thereby depriving it of a liberty interest without the requisite due process.
 
 
 13
 A separate group of plaintiffs, the "McNulla plaintiffs," several Kelly Kare patients, claimed, as they do now, that they had been deprived of their rights under the Medicaid program's so-called "freedom of choice" provision. See 42 U.S.C. Sec. 1396a(a)(23)(A). They argued that since the Medicaid statute gives them the right to choose any qualified Medicaid provider, they must be allowed to choose Kelly Kare.
 
 
 14
 A third group of plaintiffs, the "Cohen plaintiffs," several Kelly Kare employees, contended, as they do now, that, along with Kelly Kare, their rights under the National Labor Relations Act ("NLRA") were violated by defendants' anti-union animus. See 29 U.S.C. Sec. 158.
 
 
 15
 The district court denied plaintiffs' motion for a preliminary injunction. Judge Goettel dismissed Kelly Kare's property right claim as a basis for injunctive relief, citing the contract provision allowing for termination without cause. Because the action taken by WCDSS did not affect Kelly Kare's status as a qualified Medicaid provider, Judge Goettel held that any colorable property right stemming from section 364(2)(b) of New York's Social Services Law was not affected by the contract termination. Judge Goettel also rejected Kelly Kare's liberty-interest claim, finding that termination of a contract for no stated reason does not stigmatize a party to such a degree as to deprive it of a liberty interest.
 
 
 16
 The McNulla plaintiffs' claims were rejected on the ground that, while they had a right to continue receiving Medicaid benefits, they had no cognizable right to demand a specific provider. Finally, Judge Goettel held that plaintiffs' NLRA claims, to the extent that they might establish an impermissible motive for the termination of the contracts, were not supported by sufficient evidence to warrant injunctive relief.[1]
 
 
 17
 This appeal followed. For the reasons stated below, we affirm.
 
 DISCUSSION
 Kelly Kare's Property Interest
 
 18
 Does section 364(2)(b) of New York's Social Services Law create a property interest in a qualified Medicaid provider's continued and uninterrupted participation in the program? If so, the provider is entitled to due process before termination from participation in the Medicaid program.
 
 Section 364(2)(b) states:
 
 19
 The department of health shall be responsible for
 
 
 20
 . . . . .
 
 
 21
 (b) establishing and maintaining standards for all non-institutional health care and services rendered pursuant to this title, including but not limited to procedural standards relating to the revocation, suspension, limitation or annulment of qualification for participation as a provider of care and services, on a determination that the provider is an incompetent provider of specific services or has exhibited a course of conduct which is either inconsistent with program standards and regulations or which exhibits an unwillingness to meet such standards and regulations, or is a potential threat to the public health or safety pursuant to section two hundred six of the public health law....
 
 
 22
 N.Y.Soc.Serv.Law Sec. 364(2)(b) (emphasis added).
 
 
 23
 Kelly Kare argues that by enacting this statute the New York State Legislature intended to create a property right in the "qualified provider" status; and, thus, once qualified, due process must be afforded in order to revoke or limit a provider's qualification. From this claim of right, Kelly Kare extrapolates that its participation in Medicaid--not simply its qualification to participate--is also a protected property interest that cannot be abridged without due process. We disagree.
 
 
 24
 A property interest does not exist solely because of the importance of the benefit to the recipient. Nor is the "unilateral expectation" of continued receipt of the benefit sufficient to establish a property interest. Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). To establish a property interest in continued participation in the Medicaid program, Kelly Kare must demonstrate "a legitimate claim of entitlement" to such uninterrupted participation. Id.; see Perry v. Sindermann, 408 U.S. 593, 599-601, 92 S.Ct. 2694, 2698-99, 33 L.Ed.2d 570 (1972); S & D Maintenance Co. v. Goldin, 844 F.2d 962, 965-66 (2d Cir.1988).
 
 
 25
 Property interests flow not from the Constitution itself, but from "existing rules or understandings that stem from an independent source such as state law...." Roth, 408 U.S. at 577, 92 S.Ct. at 2709; see RR Village Ass'n v. Denver Sewer Corp., 826 F.2d 1197, 1201 (2d Cir.1987). Looking to state law, "we focus initially on the relevant statute, regulation, or contract establishing eligibility for the government benefit at issue." Plaza Health Laboratories, Inc. v. Perales, 878 F.2d 577, 581 (2d Cir.1989). If the statute, regulation, or contract in issue vests in the state significant discretion over the continued conferral of that benefit, it will be the rare case that the recipient will be able to establish an entitlement to that benefit. Id.; RR Village Ass'n, 826 F.2d at 1201-02.
 
 
 26
 On the other hand, when state law supports a party's legitimate claim of entitlement to a governmental benefit, that benefit cannot be stripped without procedural due process; and federal law determines what process is due. See Cleveland Board of Education v. Loudermill, 470 U.S. 532, 538-41, 105 S.Ct. 1487, 1491-93, 84 L.Ed.2d 494 (1985); RR Village Ass'n, 826 F.2d at 1201. When a state-conferred benefit ripens into a property right, any procedures that the state establishes for the revocation of that interest must comport with federal procedural due process requirements. Loudermill, 470 U.S. at 540-41, 105 S.Ct. at 1492-93; Logan v. Zimmerman Brush Co., 455 U.S. 422, 431-32, 102 S.Ct. 1148, 1155-56, 71 L.Ed.2d 265 (1982).
 
 
 27
 Kelly Kare argues that section 364(2)(b) creates a legitimate expectation of continued participation in the Medicaid program by a qualified Medicaid provider. As such, claims Kelly Kare, both the Department of Social Services' regulation 504.7(a), which allows for termination without cause, as well as the substantively similar contractual provision in issue, unconstitutionally limit this property right.
 
 
 28
 While we have addressed the issue of whether a health-care provider has a property interest in continued participation in the Medicaid program in the past, compare Plaza Health Laboratories, 878 F.2d at 582 (structure of New York's Medicaid laws suggests that a provider does not have a property interest in continued participation) with Patchogue Nursing Center v. Bowen, 797 F.2d 1137, 1144-45 (2d Cir.1986) (providers maintain property interest in continued participation in Medicaid), cert. denied, 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed.2d 828 (1987) and Case v. Weinberger, 523 F.2d 602, 606 (2d Cir.1975) (same), we have not yet squarely addressed it in this context. An examination of our earlier cases reveals that they are not necessarily inconsistent. Both Patchogue Nursing and Case involved situations totally dissimilar to the present one, in which the institutional providers, i.e., nursing homes, were facing suspension or removal of their federal certification as qualified nursing homes. In Plaza Health, we focused on the structure of New York's regulatory scheme--which was modified after the decisions in Patchogue Nursing and Case--and opined that the State's retention of significant discretion in continuing a qualified provider's participation raised a doubt as to the existence of a property right in continued participation. Furthermore, in Plaza Health, we side-stepped the issue, because we determined that regardless of whether a property interest existed, sufficient process had been afforded to pass constitutional muster.
 
 
 29
 The present argument is a bit different from that in Plaza Health. Kelly Kare cites to New York's statutory scheme, as opposed to its regulatory scheme, in making its claim of entitlement. In essence, Kelly Kare argues that regulation 504.7(a) conflicts with section 364(2)(b) of New York's Social Services Law--which it claims creates a property right in continued participation--and is perforce unconstitutional. Kelly Kare claims that because section 364(2)(b) prescribes specific reasons for the Department of Health to revoke, limit, or terminate a provider's qualification to participate in Medicaid, the Legislature intended that participation could be terminated only for one of these reasons. Absent such cause, claims Kelly Kare, participation by a qualified provider cannot be terminated. We disagree.
 
 
 30
 We discern in section 364(2)(b) no property interest in continued participation. Notwithstanding that there may be a property interest in a provider's status as a qualified health-care provider--a question we need not and do not reach--it is clear that nothing in section 364(2)(b) entitles Kelly Kare to uninterrupted participation in the program, i.e., a continuing reimbursement contract.
 
 
 31
 There is a critical difference between being declared a qualified health-care provider and being awarded a contract to furnish health-care services. The refusal by a social services district to enter a contract with a qualified provider in no way affects the status of the provider. Such a disappointed provider remains free to seek a contract with a different social services district. Furthermore, the wording of section 364(2)(b) belies Kelly Kare's claim that it has a right to participate in the program. The statute specifically focuses on a provider's status as qualified; continuous participation is not addressed.
 
 
 32
 Kelly Kare has no cognizable property interest stemming either from the regulations or the contract. Both allow the government entity to terminate participation without cause. Such vast discretion over the conferral of a governmental benefit--namely, continued, uninterrupted participation in Medicaid--is fatal to a claim of entitlement to that benefit.[2] See Plaza Health, 878 F.2d at 581; Walentas v. Lipper, 862 F.2d 414, 419 (2d Cir.1988), cert. denied, 490 U.S. 1021, 109 S.Ct. 1747, 104 L.Ed.2d 183 (1989); RR Village Ass'n, 826 F.2d at 1201-02. We note that cases from the New York State courts interpreting the present regulatory scheme, including 18 NYCRR Sec. 504.7(a), have concluded that no legitimate entitlement to continued participation exists. See, e.g., Ray Pharmacy, Inc. v. Perales, 564 N.Y.S.2d 767, 768 (1st Dep't 1991); Bezar v. New York State Department of Social Services, 151 A.D.2d 44, 49, 546 N.Y.S.2d 195, 198 (3d Dep't 1989).
 
 
 33
 Furthermore, we are unimpressed by Kelly Kare's argument that it heightened its legitimate expectation of continued participation when it agreed to the proposed rate schedule for 1991. No contract arose because of Kelly Kare's assent to the new rates, and both the County and the State certainly maintained significant discretion to refuse to enter into a final and binding contract.
 
 
 34
 We emphasize that defendants' action does not bear on Kelly Kare's status as a qualified provider. We hold only that section 364(2)(b) of New York's Social Services Law does not create a property interest in continued participation in the Medicaid program. Further, Kelly Kare has not, nor could it, point to anything in the regulations of the Department of Social Services or in the contract that would entitle it to continued and uninterrupted participation in Medicaid. Therefore, no property interest exists.
 
 Kelly Kare's Liberty Interest
 
 35
 The next question is whether the termination of Kelly Kare's provider contract amounts to a deprivation of a liberty interest. Kelly Kare claims that the innuendo flowing from the without-cause termination is sufficiently stigmatizing to amount to a deprivation of a liberty interest. Again, we must disagree.
 
 
 36
 It is now a commonplace that an entity may have a liberty interest in its good name, and if its reputation is besmirched by governmental action, it may be entitled to a name-clearing hearing.[3] See Wisconsin v. Constantineau, 400 U.S. 433, 437-39, 91 S.Ct. 507, 510-11, 27 L.Ed.2d 515 (1971) ("[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential"); Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 446 (2d Cir.1980). The injured party's liberty is at stake when governmental action places "on him a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities." Roth, 408 U.S. at 573, 92 S.Ct. at 2707. To prevail on such a liberty-interest claim, a plaintiff must establish that the information was stigmatizing, false, and publicized by the state actor. Brandt v. Board of Cooperative Educational Services, 820 F.2d 41, 43 (2d Cir.1987); Quinn, 613 F.2d at 446; Gentile v. Wallen, 562 F.2d 193, 197 (2d Cir.1977).
 
 
 37
 Kelly Kare has not begun to establish that defendants published any false statements that would stigmatize it. Defendants simply provided no reason for the termination. While the contract cancellation may have become public knowledge, we see nothing false or sufficiently stigmatizing flowing from this without-cause termination that would amount to a deprivation of a liberty interest. We cannot agree that the innuendo--if any--that stems from a without-cause termination is tantamount to a false accusation by defendants.
 
 
 38
 This Court has previously cautioned against extending overbroad constitutional protections to government contracts. See S & D Maintenance Co., 844 F.2d at 970-71. A free-floating liberty interest cannot rest on speculation that negative implications will flow from a termination without cause. The supposed consequences, if any, are too attenuated from the state action. To recognize such a right would create a liberty-interest claim whenever a state actor exercised a contractual option to terminate a government contract without cause. This we refuse to do.[4]
 
 Due Process Claims of the McNulla Class
 
 39
 We turn finally to the claim that the McNulla plaintiffs--Kelly Kare's patients--have been deprived without due process of their statutorily granted freedom to choose among qualified Medicaid health-care providers. We find this claim to be without merit.
 
 
 40
 Pursuant to federal law, eligible Medicaid recipients are given a "freedom of choice" among qualified health-care providers. The relevant statute provides:
 
 
 41
 [A]ny individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required (including an organization which provides such services, or arranges for their availability, on a prepayment basis), who undertakes to provide him such services....
 
 
 42
 42 U.S.C. Sec. 1396a(a)(23)(A) (emphasis added). The McNulla plaintiffs argue that if Kelly Kare's status as a qualified provider had not been affected, they would have had a right to choose Kelly Kare as their provider, and that right has now been denied them without due process. While this argument has a certain semantic appeal, it misses the point.
 
 
 43
 Medicaid's freedom of choice provision is not absolute. See O'Bannon v. Town Court Nursing Center, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980). In O'Bannon, the Supreme Court held that Medicaid-eligible nursing home patients did not have a vested right to choose a nursing home that was being decertified as a health-care provider. Id. at 785, 100 S.Ct. at 2475. The Court stated that the freedom of choice provision was intended to give beneficiaries "the right to choose among a range of qualified providers, without government interference." Id. (emphasis in original).
 
 
 44
 We read O'Bannon as holding that a Medicaid recipient's freedom of choice rights are necessarily dependent on a provider's ability to render services. No cognizable property interest can arise in the Medicaid recipient unless the provider is both qualified and participating in the Medicaid program. When the source of government benefits runs dry through legitimate state action, beneficiaries are hard-pressed to establish a legitimate entitlement to that benefit. See O'Bannon, 447 U.S. at 798, 100 S.Ct. at 2482 (Blackmun, J. concurring).
 
 
 45
 We therefore conclude that the McNulla plaintiffs do not have a property interest in their freedom to choose Kelly Kare as their provider because Westchester County has properly cancelled Kelly Kare's contract.
 
 
 46
 Additionally, the McNulla plaintiffs do not have a cognizable liberty interest in choosing Kelly Kare as their health-care provider. The O'Bannon Court distinguished between direct Medicaid benefits--financial assistance--and indirect ones--e.g., freedom of choice. The Court held that state action that incidentally burdens an indirect governmental benefit does not rise to the level of a deprivation of a liberty interest. See id. at 786-88, 100 S.Ct. at 2475-77.
 
 
 47
 The McNulla plaintiffs have suffered an incidental burden on their right to choose among qualified and participating health-care providers. Their direct benefits clearly have not been altered. They shall continue to receive government-sponsored home health assistance, albeit from a different provider. Such an incidental burden certainly does not infringe on any liberty interest.
 
 
 48
 Again, we conclude that the district court correctly determined that the McNulla plaintiffs had no property or liberty interest at stake, and, therefore, properly refused to enjoin defendants.
 
 CONCLUSION
 
 49
 For the foregoing reasons, plaintiffs have no viable liberty or property interest claims; nor have they approached a threshold showing of a violation of the NLRA sufficient to justify a preliminary injunction. We conclude, therefore, that the district court did not abuse its discretion in refusing to order injunctive relief.
 
 
 50
 Affirmed.
 
 
 
 [1]
 At the outset, we have considered plaintiffs' argument that they are entitled to a preliminary injunction because of defendants' violations of the NLRA. Plaintiffs contend that they have met the requirements of the less restrictive preliminary injunction standard. This lesser standard provides that, in addition to demonstrating irreparable harm, a party is entitled to a preliminary injunction upon a showing of either likelihood of success or sufficiently serious questions going to the merits and a balance of the hardships in favor of the party seeking relief. See Union Carbide Agricultural Products Co. v. Costle, 632 F.2d 1014, 1017 (2d Cir.1980), cert. denied, 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981). We must disagree with plaintiffs' contention. We do not imply that plaintiffs would be barred from obtaining relief were they able to establish an impermissible motive behind defendants' actions. See Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 110 S.Ct. 444, 449-52, 107 L.Ed.2d 420 (1989) (Golden State II ); Golden State Transit Corp. v. City of Los Angeles, 475 U.S. 608, 615-19, 106 S.Ct. 1395, 1399-1401, 89 L.Ed.2d 616 (1986) (Golden State II ). We hold only that plaintiffs have failed to make a sufficient threshold showing to justify injunctive relief, even under the less restrictive standard
 
 
 [2]
 We observe that when this Court decided Patchogue Nursing and Case, New York's regulatory scheme did not provide for without-cause termination. Additionally, as previously stated, these cases related to decertification
 
 
 [3]
 We are mindful of the Supreme Court's ruling that defamation alone does not raise a due process claim. See Paul v. Davis, 424 U.S. 693, 701-02 & 710-13, 96 S.Ct. 1155, 1160-1161 & 1164-66, 47 L.Ed.2d 405 (1976). In light of our holding that Kelly Kare has completely failed to establish that any stigma attached to it, we do not consider this question
 
 
 [4]
 We express no opinion as to the viability of a liberty interest claim stemming from a termination for cause pursuant to 18 N.Y.C.R.R. Sec. 504.7(b)