[706 NYS2d 739]

Ulster Home Care, Inc., et al., Appellants, v Dennis C. Vacco, as Attorney General of the State of New York, Respondent.

Third Department, April 13, 2000

## APPEARANCES OF COUNSEL

*Tobin & Dempf,* Albany (*Raul A. Tabora, Jr.,* of counsel), for appellants.

*Eliot Spitzer, Attorney General,* New York City (*Elizabeth T. Bogren* of counsel), for respondent.

*Mark Thomas,* Albany, for Healthcare Association of New York State, *amicus curiae.*

*Whiteman, Osterman & Hanna,* Albany (*Heather D. Diddel* of counsel), for New York State Association of Health Care Providers Inc., *amicus curiae.*

*Gleason, Dunn, Walsh & O'Shea,* Albany (*Thomas F. Gleason* of counsel), for Home Care Association of New York State, *amicus curiae.*

## OPINION OF THE COURT

CARPINELLO, J.

Plaintiff Ulster Home Care, Inc. is the operator of a licensed home care agency enrolled in the Medicaid program and provides personal care services to eligible Medicaid recipients pursuant to a contract, renewed annually, with the Ulster County Department of Social Services, which is responsible for various administrative aspects of the Medicaid program in Ulster County (*see,* Social Services Law §§ 365, 365-a [2] [d]; §§ 367-j, 367-k, 367-n, 367-p). Although Medicaid clients account for a majority of its revenue, Ulster Home also provides personal care services to non-Medicaid clients. The charges for services to non-Medicaid clients can be paid in a variety of ways, i.e., by third-party payor sources, such as health maintenance organizations, health insurance companies and non-Medicaid State agencies, or directly by the client (this latter category is often referred to as the self-pay clients).

In April 1997, Ulster Home was the subject of an audit and investigation conducted by the Office of the Attorney General through its Medicaid Fraud Control Unit (hereinafter MFCU). According to Ulster Home, its counsel met with members of MFCU's investigative staff in March 1998 and was advised that the focus of their investigation concerned 18 NYCRR 505.14 (h) (7) (ii) (a), which provides that:

"(1) Medical assistance payments to personal care services providers for any rate year beginning on or after January 1, 1994, are made at the lower of the following rates:

"(i) the rate the provider charges the general public for personal care services; or

"(ii) the rate determined by the department in accordance with [a cost-based methodology]."

Specifically, Ulster Home was advised that MFCU's investigation revealed that it should have been reimbursed pursuant to item (i) of the regulation (hereinafter the public charge portion of the regulation), as opposed to item (ii) of the regulation (the cost-based methodology), because the rate it charged the "general public" was lower than the rate established by the former Department of Social Services (hereinafter DSS).[1] At this time, an overpayment of nearly $1.2 million was apparently being sought.[2] Thereafter, MFCU limited its finding to the period May 1995 through mid-1997 and the recovery allegedly due the State was reduced to $675,000.

Alleging that Ulster Home's Medicaid billing practices were undertaken with the express purpose of enriching itself at the expense of the taxpayers and that Ulster Home knowingly lied to the State about its actual charges, MFCU seeks to prosecute it for larceny and offering a false instrument for filing. Faced with the prospect of criminal prosecution because of its alleged violation of the public charge portion of the regulation, Ulster Home commenced this action seeking declaratory and injunctive relief. Plaintiffs James Mahoney and Diane Wiegand, Ulster Home's Executive Director and Assistant Executive Director, respectively, were granted permission to intervene. On a prior appeal, this Court affirmed an order of Supreme Court issuing a preliminary injunction against defendant enjoining the enforcement of the public charge regulation, as well as an order finding defendant in contempt of court (255 AD2d 73).

Following this Court's decision, Ulster Home moved for summary judgment seeking a declaration that defendant's threatened prosecution violates the contracts between itself and Ulster County, that defendant should be prohibited from enforcing the public charge portion of the regulation on a retroactive basis, that defendant should be prohibited from demanding repayment of funds received by Ulster Home under its

---

**1.** The Department of Social Services was dissolved in 1997 and its functions were distributed, as relevant to this case, to the Department of Health (*see*, L 1997, ch 436). Nevertheless, reference to the Department of Social Services will be made in this decision even though, in certain contexts, it might be more precise to refer to the Department of Health.

**2.** Ulster Home was previously reimbursed at a rate of $13.36 per hour, this rate having been set by DSS based on the cost-based methodology. According to MFCU, it charged the "general public" $12.00 per hour. It is this differential that MFCU claims was overpaid to Ulster Home.

contracts with Ulster County and, most importantly, that defendant should be enjoined from attempting to impose any criminal or civil liability as a result of enforcement of the public charge portion of the regulation. Supreme Court denied the motion, prompting this appeal by Ulster Home. Various *amici curiae* briefs have been submitted in support of Ulster Home's position.

To fully understand the nature of this action, a brief overview of the Medicaid reimbursement program with respect to personal care services is necessary. From the inception of the personal care services program through 1994, providers such as Ulster Home had been reimbursed at rates they negotiated with social service districts around the State. This methodology resulted in negotiated payment rates which did not necessarily reflect a provider's actual costs, lacked uniformity from district to district and placed an additional administrative burden upon social service districts (i.e., negotiating payment rates) (*see*, NY Reg, Oct. 13, 1993, at 43). Pursuant to the Laws of 1990 (ch 53), DSS was directed to submit to the Legislature and the Governor a plan containing criteria for the establishment of a rate-setting methodology for personal care services (*see also*, L 1993, ch 59, § 61; L 1992, ch 41, § 3). The goal of the Legislature at this time "was to require [DSS] to develop a rate setting methodology for personal care services that considers personal care services providers' *actual costs* of providing services to [Medicaid assistance] recipients" (NY Reg, Oct. 13, 1993, at 44 [emphasis supplied]). Pursuant to this legislative authority, DSS promulgated regulations establishing a new methodology by which payment rates for personal care services provided on or after January 1, 1994 would be calculated. The regulation changed not only the method by which these rates would be established but also changed the entity responsible for establishing such rates (*see*, 18 NYCRR 505.14 [h] [7]).

Consequently, under the revised regulatory scheme, payment rates were no longer based on district negotiated rates; rather, they were determined by DSS based upon the methodology defined in 18 NYCRR 505.14 (h) (7) (ii) and approved by the Division of Budget (*see*, NY Reg, Oct. 13, 1993, at 45). Under the regulations, a provider with cost experience, like Ulster Home, reported its operating costs to DSS on a cost report, which, in turn, is used by DSS to establish that provider's rate (*see*, NY Reg, Oct. 13, 1993, at 43). As previously noted, since 1994, DSS has calculated Ulster Home's rate during the relevant time period using this cost-based methodology.

In turning to our legal analysis, we reiterate, as strenuously emphasized by Ulster Home and the *amici curiae*, that a provider's approved Medicaid reimbursement rate is calculated by DSS, *not* the provider, and that the provider merely submits the required costs report to DSS (*see*, 18 NYCRR 505.14 [h] [7] [i]). Once its rate is set, the provider submits bills to Medicaid for payment at the approved rate (*see*, 18 NYCRR 505.14 [h] [1]; 540.7). Thus, these parties argue that a gross injustice would result by criminalizing the conduct of a provider who bills Medicaid at a *DSS* promulgated and approved cost-based rate instead of "the rate" it charges the "general public." This concern is indeed compelling. Equally compelling, however, is the need on behalf of the public fisc to prosecute any provider who, although lacking the authority to *set* its reimbursement rates, submits false information to the State on, for example, a cost report in order to wrongfully obtain State funds.

We now address the heart of Ulster Home's complaint in this matter, namely, the constitutionality of the public charge portion of the regulation. Ulster Home claims, and we agree, that the public charge portion of the regulation is unconstitutionally vague. "A vagueness challenge to an administrative regulation raises the question of whether a reasonable person subject to the regulatory standard would comprehend what conduct was being prohibited" (*Matter of Choe v Axelrod*, 141 AD2d 235, 239). "[R]egulations must give 'sufficiently definite warning * * * when measured by common understanding and practices' * * * and articulate an objective standard which governs the exercising of the discretion and affords the possibility of meaningful judicial review" (*Matter of Slocum v Berman*, 81 AD2d 1014, 1015 [quoting *United States v Petrillo*, 332 US 1, 7-8], *lv denied* 54 NY2d 602, *appeal dismissed* 54 NY2d 752 [citations omitted]; *see*, *People v New York Trap Rock Corp.*, 57 NY2d 371, 378). Indeed, the void-for-vagueness doctrine has been called " 'the first essential of due process of law' " (*People v New York Trap Rock Corp.*, *supra*, at 378, quoting *Connally v General Constr. Co.*, 269 US 385, 391). Here, in contrast to the exhaustive guidelines and standards promulgated by DSS for implementing the cost-based methodology (*see*, 18 NYCRR 505.14 [h] [7] [ii] [a] [2]-[7]), *no* standards, guidelines or definitions were adopted under 18 NYCRR 505.14 (h) (7) (ii) (a) (1) (i) defining what constitutes "*the rate* the provider charges" (emphasis supplied) for personal care services or what constitutes the "general public" (*cf.*, *Matter of Allen v Commissioner of Social Servs. of State of N. Y.*, 116 AD2d 35, 37).

We deal first with the "general public" aspect of the regulation. While providers like Ulster Home provide personal care services to individuals covered by Medicaid, they also provide these services to individuals covered under managed care programs, to State programs associated with child protective services, to members of health maintenance organizations, to persons with private health insurance and to those who self pay. Whether the term "general public" as used in the regulation includes *all* of these non-Medicaid recipients or some combination thereof is simply not clear. It is certainly not clear that "general public" only encompasses private, self-pay clients, the interpretation Ulster Home claims that MFCU has given to the term.

Internal DSS memoranda in the record confirm that the term "general public" is not defined anywhere in DSS regulations, policy statements or updates. Thus, to the extent that MFCU might argue that the term is limited to self-pay clients, neither the regulation itself nor its regulatory history confirms this standard. We also note that, in the context of personal care services, there is no prior "judicial construction of [the term] * * * [so as] to meet the requirements of the void for vagueness doctrine" (*People v First Meridian Planning Corp.*, 86 NY2d 608, 622).

Defendant repeatedly claims that the terms "general public" and "the rate" charged have well-established meaning in the Medicaid area. Curiously, however, the "well-established" meanings of these terms are not set forth. With respect to the definition of the "general public," defendant seems to advocate that it encompasses "the rest of the [non-Medicaid] world" but also contends that it encompasses private, self-pay clients only.[3] These differing definitions notwithstanding, an internal DSS memorandum in the record reveals that it may interpret "general public" in the area of personal care service as *excluding* all

---

3. For example, defendant's brief states that "the regulations require that Medicaid patients be treated no worse than the man on the street who enters, seeks health care and pays 'out-of-pocket.' If the advertised—and actually charged—rate for this private, uninsured, self-pay patient is $12.00, Medicaid cannot be charged more." In another instance, however, the brief states: "[I]t is difficult to see what any 'guidelines' could add to a rule that plainly tells providers that their Medicaid compensation will never be any more than the rest of the world pays." The "rest of the world," in this passage, would plainly mean all non-Medicaid payors. Apparently, defendant's position seems to be that general public means whatever "group" of payors pays the *lowest* rate for personal care services, not the average blended rate of the entire non-Medicaid world.

"third party payors as well as facilities, institutions, and other [S]tate agencies" who have entered into contracts with providers. To be sure, defendant's repeated statements that the term has "a well-defined usage" without in any way specifying that usage, in conjunction with an inconsistent interpretation of the term by the very State agency charged with setting reimbursement rates, speak volumes about the depth of the controversy before this Court and the vagueness of the regulation itself.

The public charge portion of the regulation also does not define "the rate" to be charged. Again, defendant claims that this term is also well defined in the Medicaid area yet no specific definition is ever provided, particularly in the area of personal care services. Moreover, no standards, guidelines or definitions were adopted relating to this term either. In this context, it is important to note that the Medicaid rate set by DSS under the cost-based methodology for personal care services is a "blended rate." This means that the provider is reimbursed solely at one set hourly rate and no additional charges are allowed for mileage, transportation or supplies, nor is a provider allowed to charge a higher rate for services provided on a weekend or holiday. Rather, the rate set by DSS subsumes these types of additional costs, in addition to other administrative costs associated with a provider's participation in the Medicaid program, in the single approved hourly rate.

Non-Medicaid clients, on the other hand, might be charged for these items in addition to a base hourly rate for services. It is unclear under the public charge portion of the regulation if "the rate" to be charged means simply the base hourly rate charged to the "general public" or the base rate plus all other incidental charges, such as mileage, supplies, holiday differentials and the like.[4] Defendant appears to claim that the "rate charged" means the lowest hourly base rate charged to any payor group, which in this case happens to be the private, self-pay clients. Since this group of payors apparently makes up a very small percentage of the population in general (17%) and an even smaller percentage of Ulster Home's total revenue (7%), and since the hourly base rate is not the actual amount even this small group pays, the intent of the Legislature—to reimburse providers for *actual* costs—would be thwarted if a provider were reimbursed at the lowest possible base rate charged to the smallest percentage of clients.

---

4. For example, it is not clear if "the rate" charged would be $12.00, assuming that this is the base hourly charge paid by a self-pay client, or $12.00 plus expenses paid by that client.

In the absence of any guidance, we find that providers of personal care services were in fact "left to guess" (*Doe v State of New York*, 189 AD2d 199, 210; *see, Matter of Burke v Denison,* 218 AD2d 894, 896) the meaning of the public charge portion of the regulation and the effect it may have on them by submitting bills to Medicaid at a DSS approved cost-based rate (*cf., Matter of Burke v Denison, supra; Matter of Prusky v Webb,* 134 AD2d 718, 720-721). "Nor can the question be solved by resort to the established canons of construction that enable a court to look through awkward or clumsy expression, or language wanting in precision, to the intent of the Legislature" (*Connally v General Constr. Co.*, 269 US 385, 394, *supra*). Here, in promulgating the regulation, DSS was silent as to its construction of the public charge portion of the regulation. Thus, to construe the rate charged to the "general public" as meaning an average of all rates charged to non-Medicaid payors, or alternatively, the lowest rate charged to any given payor who had not entered into a contract with a provider "would be as likely to defeat the purpose of the Legislature [and DSS] as to promote it" (*id.*, at 394). Thus, in the specific context of the personal care services industry, we are constrained to find that the rate charged to the "general public," in the absence of guidance or definition, is standardless (*see, City of Chicago v Morales*, 527 US 41; *see also, People v New York Trap Rock Corp.*, 57 NY2d 371, *supra*). Accordingly, we grant the petition to the extent that it seeks to have the public charge portion of the regulation declared unconstitutional. To be sure, this declaration is limited to the public charge portion of the regulation only (i.e., 18 NYCRR 505.14 [h] [7] [ii] [a] [1] [i]) and the remainder of the regulation remains intact.

CARDONA, P. J., PETERS, GRAFFEO and MUGGLIN, JJ., concur.

Ordered that the order is reversed, on the law, without costs, motion granted, and it is declared that 18 NYCRR 505.14 (h) (7) (ii) (a) (1) (i) is unconstitutional.