*United States of America v. Moseley*

In the

# United States Court of Appeals
## For the Second Circuit

August Term, 2019

(Argued: January 6, 2020   Decided: November 3, 2020 )

Docket No. 18-2003

UNITED STATES OF AMERICA,

*Appellee,*

–v.–

RICHARD MOSELEY, SR.,

*Defendant-Appellant.*

B e f o r e :

KEARSE, CARNEY, and BIANCO, *Circuit Judges.*

Defendant-Appellant Richard Moseley, Sr., appeals from a judgment of conviction and sentence entered on July 2, 2018, by the United States District Court for the Southern District of New York (Ramos, *J.*), in connection with Moseley's operation of an illegal payday-loan scheme. A jury found that Moseley violated the Racketeer Influenced and Corrupt Organizations Act (RICO), the Truth in Lending Act (TILA), and federal wire fraud and identity theft statutes from 2004 through 2014, a period when his payday-loan business engaged in the following conduct: it lent money to borrowers in New York and other states at interest rates exceeding—by many

multiples—the maximum legal interest rates allowed in those states; in its loan documents, it failed to meet TILA disclosure requirements; and it issued loans to borrowers without their consent and then falsely represented that borrowers had, in fact, consented to the loans. The district court sentenced Moseley primarily to 120 months in prison and ordered Moseley to forfeit $49 million. On appeal, Moseley attacks both his convictions and his sentence. With regard to the RICO counts, he contends that the district court erred as a matter of law by instructing the jury that, as to his business's loans to New York borrowers, New York usury laws governed the transaction rather than the laws of the jurisdictions specified in the loan agreements, which set no interest rate caps. With regard to his TILA conviction, he maintains that his loan agreements disclosed the "total of payments" borrowers would make, as TILA requires, and that the evidence was insufficient to show that these disclosures were inaccurate. Moseley also raises several other arguments, challenging his convictions and his sentence. On review, we conclude that Moseley's arguments are unpersuasive. Accordingly, we AFFIRM the judgment of the district court.

―――――――――

DAVID ABRAMOWICZ (Edward Imperatore, Anna M. Skotko, *on the brief*) Assistant United States Attorneys, Of Counsel, *for* Audrey Strauss, Acting United States Attorney for the Southern District of New York, New York, NY, *for Appellee United States of America*.

AMY ADELSON (Daniela Elliott, Of Counsel, *on the brief*), Law Offices of Amy Adelson LLC, New York, NY, *for Defendant-Appellant Richard Moseley, Sr.*

―――――――――

CARNEY, *Circuit Judge*:

Defendant-Appellant Richard Moseley, Sr., appeals from a judgment of conviction and sentence entered on July 2, 2018, by the United States District Court for the Southern District of New York (Ramos, *J.*), in connection with Moseley's operation of an illegal payday-loan scheme. A jury found that Moseley violated the Racketeer Influenced and Corrupt Organizations Act (RICO), the Truth in Lending Act (TILA),

and federal wire fraud and identity theft statutes from 2004 through 2014, a period when his payday-loan business engaged in the following conduct: it lent money to borrowers in New York and other states at interest rates exceeding—by many multiples—the maximum legal interest rates allowed in those states; in its loan documents, it failed to meet TILA disclosure requirements; and it issued loans to borrowers without their consent and then falsely represented that borrowers had, in fact, consented to the loans. The district court sentenced Moseley primarily to 120 months in prison and ordered Moseley to forfeit $49 million. On appeal, Moseley attacks both his convictions and his sentence. With regard to the RICO counts, he contends that the district court erred as a matter of law by instructing the jury that, as to his business's loans to New York borrowers, New York usury laws governed the transaction rather than the laws of the jurisdictions specified in the loan agreements, which set no interest rate caps. With regard to his TILA conviction, he maintains that his loan agreements disclosed the "total of payments" borrowers would make, as TILA requires, and that the evidence was insufficient to show that these disclosures were inaccurate. Moseley also raises several other arguments, challenging his convictions and his sentence. On review, we conclude that Moseley's arguments are unpersuasive. Accordingly, we AFFIRM the judgment of the district court.

## BACKGROUND

### I.     Moseley's Offense Conduct[1]

Beginning in approximately 2004 and continuing through 2014, Moseley ran a form of what is generally known as a payday-loan business,[2] utilizing several domestic and foreign entities, including entities incorporated in Nevada, the Federation of Saint Kitts and Nevis (together, "Nevis"), and New Zealand.[3] Throughout this period, Moseley and his employees administered the enterprise solely from offices physically located in Kansas City, Missouri. In September 2014, the Consumer Financial Protection Bureau shut the business down on the basis of the illegalities later prosecuted here against Moseley individually.

Moseley's business offered small-dollar, short-term, unsecured loans in amounts up to $500. Instead of charging a traditional interest rate, Moseley's business charged "fees" that functioned, in effect, as interest payments. Utilizing the Internet as its

---

[1] Because Moseley appeals his conviction by a jury, "our statement of the facts views the evidence in the light most favorable to the government, crediting any inferences that the jury might have drawn in its favor." *United States v. Rosemond*, 841 F.3d 95, 99-100 (2d Cir. 2016).

[2] The Consumer Financial Protection Bureau advises, "While there is no set definition of a payday loan, it is usually a short-term, high cost loan, generally for $500 or less, that is typically due on your next payday. Depending on your state law, payday loans may be available through storefront payday lenders or online." *What is a Payday Loan?*, Consumer Financial Protection Bureau, https://www.consumerfinance.gov/ask-cfpb/what-is-a-payday-loan-en-1567 (last visited Sept. 2, 2020); *see also United States v. Grote*, 961 F.3d 105, 109 (2d Cir. 2020) ("Payday loans are small loans typically to be repaid on the borrower's next payday.").

[3] Moseley controlled several business entities that went by different names. These included SSM Group, LLC; CMG Group, LLC; DJR Group, LLC; BCD Group, LLC; and Hydra Financial Limited Funds I through IV. Because their functions were virtually identical and they were supported by a single administrative apparatus, we need not differentiate among them here, and we refer to their activities as a single "business."

platform, Moseley's business directly credited the borrower's bank account with the loan principal using the borrower's private banking information. For each "loan period" (that is, the term before repayment was due or the loan was "refinanced," App'x 570), Moseley charged a $30 fee (the "finance charge") for each $100 of the borrower's total loan amount. These fees were automatically debited by Moseley's business from the borrower's bank account and credited to Moseley's entity at the end of the first loan period. But, unlike the debited fees, repayment of the principal would not automatically occur. Instead, unless the borrower affirmatively acted to pay off the principal by the end of the two-week loan term, the loan would be "refinanced" and the term automatically extended. For each such extension, an additional and equal fee would be debited against the borrower's account and credited to Moseley's business.

In fact, absent an affirmative act by the borrower to pay off the principal, Moseley would continue debiting the account as described. This meant that a $100 loan could—and on occasion did—cost the borrower $30 in fees charged every other week, or approximately 26 times over the course of a year: in other words, it could lead to total finance charges of $780 on the original $100 loan, in effect an approximate yearly interest rate of 780 %. Moseley's business would credit none of these fees toward repayment of the loan principal.

Although some borrowers did put a halt to the debiting by paying off their loans, continued fee collection in amounts totaling far more than the principal was far from uncommon in Moseley's operation. For example, at one point in 2013, the business records reflect 2,513 active accounts for borrowers living in New York. Approximately 24 % of those accounts (600 of them) had been debited for at least 12 fee payments.

5

Moseley generally would allow his staff to "zero out" an account—that is, to stop future debiting—only after 40 or 45 separate finance charges had been paid. App'x 760-61.

While lucrative to him, the business's extremely high effective annual interest rates posed a legal problem. Many states cap the legal interest rate at a level far below the effective rates Moseley sought to charge. New York law, for example, sets the civil usury rate at 16 % for unlicensed lenders and treats all usurious contracts (that is, contracts violative of that rate) as void. *See* N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a(1).[4] It sets the criminal usury rate at 25 %—that is, at a rate exceeding 25 %, lending becomes a crime in New York. N.Y. Penal Law § 190.40.

Therefore, as part of a strategy to avoid such caps, in his early years of operation Moseley incorporated entities in Nevada, and, after 2006, offshore, in Nevis and New Zealand. None of the three jurisdictions has usury laws. Moseley then edited the loan agreements that he provided his borrowers online to include a choice-of-law provision specifying that the law of one of these three jurisdictions governed the transaction.

Moseley received numerous borrower complaints while his business operated and drew substantial regulatory scrutiny from state attorneys general beginning at least as early as 2010. In response, he engaged in various techniques to disguise the fact that the enterprise's actual operations and personnel were located solely in Missouri, and to evade regulatory action. These moves included, for example, marking "return to sender" on mail sent to and received by the Missouri office to imply that Missouri was

---

[4] Licensed lenders, in contrast, are allowed to charge interest rates of up to 25 %. *See* N.Y. Banking Law §§ 340, 356. Moseley's business was unlicensed, but his model generated charges that violated the licensed lenders' maximum rate as well.

not the operation's locus and misrepresenting the administrative staff's location in conversations with borrowers who complained by phone.

Concurrently with these operations and evasions, and as part of a separate scheme, Moseley also issued loans to borrowers without their consent and began to debit "fees" related to these unauthorized loans. This worked as follows.

A potential borrower in search of a short-term cash infusion would enter certain personal information online in a "lead generator" website maintained by a third party engaged by Moseley's business. (A "lead generator" website is one in which a potential customer may express an interest—as relevant here, in receiving a loan—but has not been provided the loan's terms and is not actually agreeing to receive one.) Upon getting that expression of interest, the "lead generator" third party would then forward the prospective borrower's information to Moseley's business and its role in the transaction would be complete.

Moseley would then have his employees attempt to contact the potential borrower by phone and try to obtain borrower approval for making a loan. If phone contact was made, the employee explained the loan's terms by phone to the potential borrower, who could then accept or decline the offer. If the potential borrower did not answer the phone, employees would leave a voicemail message about the offer and the loan would be approved and made anyway, even absent the borrower's consent. (This was possible only because individuals provided banking information at the get-go, in their inquiry to the "lead generator," without having established a business relationship or entered into an agreement.) In any event, Moseley's business would then deposit the loan principal into the "borrower's" account and begin deducting fees.

In testimony provided at trial, one of Moseley's employees estimated that, of the business's total loans, it had never made direct contact with approximately 70 % of eventual borrowers. Although all borrowers eventually received loan documents by email, the e-signatures on those documents were falsified.[5]

Finally, the disclosures contained in Moseley's loan agreement documents fell short of complying with applicable federal consumer protection laws. Among other requirements, the TILA and its implementing regulations mandate that the lender disclose to the borrower, when originating the loan, the "total of payments": that is, how much *in total* the borrower is "scheduled" to pay to close out the loan and cover all related liabilities. *See* 15 U.S.C. § 1638(a)(6); 12 C.F.R. § 226.18(h). Moseley's "Loan Note and Disclosure" documents included a text box labelled "Total of Payments" that it described to the borrower as "[t]he amount you will have paid after you have made the scheduled payment." *See, e.g.*, Supp. App'x 58. The figure displayed in this text box was the sum of the loan principal and a single finance charge (or "fee"). The "total of payments" disclosure did not indicate in any way to the borrower, however, that *no* repayment of the principal was actually "scheduled" to occur—that is, that *no* payment toward principal would occur automatically on a certain date or dates. Nor, conversely, did it indicate that indefinitely recurring finance charges *were* "scheduled" to occur. Rather, text in fine print below the disclosure box advised that the single payment of

---

[5] At trial, Moseley attempted to demonstrate through testimony that borrowers "e-signed" the agreements when they inquired about loans. Substantial evidence to the contrary was adduced by the government, however. The jury could have concluded that those borrowers whom Moseley's staff did not contact by phone had no notice of loan terms and had no opportunity to accept (or reject) those terms before the related credits and debits began. In a similar vein, evidence also indicated that the business generated loan agreements bearing false e-signatures and purporting to show, inaccurately, that borrowers agreed to loans.

loan principal and a single finance charge whose sum it displayed would become "scheduled" only if the borrower signed a specified separate form and "fax[ed] it back to our office at least three business days before your loan is due." *Id.* The "total of payments" disclosure was thus inaccurate for any borrower who did not affirmatively and timely act—by sending a facsimile—to pay off her loan principal.

These three courses of conduct—the entities' attempts to evade usury laws; their approval of loans without obtaining borrowers' knowing consent; and their posting of misleading TILA disclosures—formed the factual basis for Moseley's prosecution and conviction. The government focused on New York-domiciled borrowers for purposes of the RICO prosecution, but had no geographic focus for the borrowers of concern in the wire fraud, identity theft, and TILA charges.

Our decision in this case follows closely on the heels of another decision issued by our court earlier this year, which also concerned the prosecution under RICO, TILA, and on other charges of defendants involved in a nationwide payday-loan operation. *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020). Although the scheme undergirding that prosecution concerned lenders who sought to immunize some of their unlawful operations under the mantle of tribal sovereign immunity, not (as here) through choice-of-law clauses specifying jurisdictions without usury laws, the two operations were similar in many respects and raise some related legal questions, as will become apparent. *See id.* at 110-13.

## II. Procedural History

In 2016, Moseley was indicted on RICO, wire fraud, identity theft, and TILA charges in the Southern District of New York. He pleaded not guilty and went to trial in

9

October 2017 on the six counts listed in the Superseding Indictment.[6]

During the three-week long trial, Moseley's defense consisted primarily of claimed ignorance: he argued to the jury that he did not know that the actions his business took were illegal. Moseley testified in his own defense. At the trial's conclusion, the jury deliberated and found Moseley guilty on all counts. Moseley's Rule 29 and Rule 33 post-trial motions were denied.

In June 2018, the district court sentenced Moseley primarily to an incarceratory sentence of 120 months and ordered that he forfeit $49 million, tied to his business's issuance of loans without borrower consent.

Moseley timely noticed his appeal.

## DISCUSSION

We first discuss Moseley's challenges to his RICO convictions (for RICO conspiracy and substantive violations); then, his attack on his TILA conviction; and finally, his additional arguments assailing the various aspects of the district court proceedings.

## I.    RICO Counts

Moseley cites three separate bases for his contention that we should reverse his RICO convictions. He argues: (A) the district court erroneously disregarded contractual

---

[6] More specifically, the six counts were: (1) conspiracy to collect unlawful debts under RICO, in violation of 18 U.S.C. § 1962(d); (2) collection of unlawful debts, in violation of 18 U.S.C. §§ 1962(c) and 2; (3) conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; (4) wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; (5) aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b), and 2; and (6) making false disclosures under TILA, in violation of 15 U.S.C. § 1611 and 18 U.S.C. § 2.

choice-of-law provisions when fashioning the jury instructions; (B) the prosecution violated Moseley's due process right to fair warning by charging him under RICO; and (C) the evidence was insufficient to establish that he had the requisite guilty mental state. For the reasons that follow, we reject all three contentions.

As background for the discussion, the following information will be useful. Moseley's RICO convictions rest on 18 U.S.C. § 1962(c). In relevant part, section 1962(c) reads:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through . . . collection of unlawful debt.

18 U.S.C. § 1962(c). Section 1961(6) of title 18 defines "unlawful debt" for RICO purposes as follows:

> "[U]nlawful debt" means a debt (A) . . . which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate . . . .

*Id.* § 1961(6). As is evident, the statute's definition of "unlawful debt" invokes state as well as federal laws related to usury to provide substance to the concept of "unlawful[ness]."

Based on these provisions, we have held that convicting a defendant of an "unlawful debt" RICO violation in connection with a usurious loan to a borrower domiciled in New York requires proof of five elements: "[1] that a debt existed, [2] that it was unenforceable under New York's usury laws, [3] that it was incurred in

11

connection with the business of lending money at more than twice the legal rate, [4] that the defendant aided collection of the debt in some manner, and [5] that the defendant acted knowingly, willfully and unlawfully." *United States v. Biasucci*, 786 F.2d 504, 513 (2d Cir. 1986).[7] This summary has been our guide since *Biasucci* was decided, in 1986.

In 2020, however, we reviewed the fifth requirement—scienter—in *Grote*, 961 F.3d 105, and we observed that our discussion in *Biasucci* displayed some internal inconsistencies. As just quoted, our court stated in *Biasucci* that the defendant must have acted "knowingly, willfully and unlawfully" to be convicted. *Biasucci*, 786 F.2d at 513. In reaching its conclusion in that case, the *Biasucci* court asserted that "RICO imposes no additional *mens rea* requirement beyond that found in the predicate crimes." *Id.* at 512. It then based its decision that the RICO statute was satisfied there by resting on proof of the predicate crime in that case, New York Penal Law § 190.40, "Criminal Usury in the Second Degree." *Id.* Although the statutory text refers to a "knowing[]" act, section 190.40 has been construed not to require knowledge of the unlawfulness of the proscribed receipt of excessively high interest. *See Grote*, 961 F.3d at 118 n.4.[8] The *Biasucci* court thus applied—as we described it in *Grote*—a "standard that did *not*

---

[7] Unless otherwise noted, this Opinion omits from quoted language all internal quotation marks, brackets, alterations, and citations.

[8] It provides:

> A person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or for[]bearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period. Criminal usury in the second degree is a class E felony.

N.Y. Penal Law § 190.40.

require a showing of willfulness or of awareness of the unlawful nature of the conduct." *Id.* at 118 (emphasis added).

In light of our commentary in *Biasucci*, the *Grote* court observed that we appear to have adopted the following syllogism: (1) the scienter requirement for RICO unlawful debt collection is drawn from the underlying usury statutes, and (2) a RICO prosecution may be based on the violation of a civil usury statute that lacks a scienter requirement entirely, therefore (3) a criminal RICO violation may carry no scienter requirement at all. *Id.* at 118-19. As we further pointed out in *Grote*, this anomalous result appears to contradict the Supreme Court's "presumption in favor of a scienter requirement" for criminal statutes. *Elonis v. United States*, 135 S. Ct. 2001, 2011 (2015).

Ultimately, the *Grote* court declined to identify the requisite mental state for the unlawful debt RICO violation, taking refuge in the circumstance of that case that, even applying a heightened willfulness standard (that is, a requirement that a knowingly unlawful and willing act be proven), "the jury [found] (based on overwhelming evidence of that fact) that the Defendants were aware of the unlawful nature of the lending scheme." *Grote*, 961 F.3d at 117.

We do the same, and assume without deciding that, to secure a conviction under RICO for unlawful debt collection in New York, the government had to prove Moseley's knowledge of the unlawful nature of his actions. *See id.* ("[W]e express no view on whether willfulness or awareness of unlawfulness was required for conviction under [RICO]."). As we discuss below, the assumed requirement poses no barrier to the convictions obtained by the government in Moseley's case.

13

A.    Challenge to the jury instructions

As to the legality of the rates charged by his business, Moseley contends that the district court erred by instructing the jury that New York usury laws applied to his payday loans to borrowers domiciled in New York. He argues that the jury instructions were incorrect because they gave no effect to the choice-of-law provisions set out in the loan agreements. As noted above, these specified variously that their terms and enforcement were to be governed by the laws of the jurisdictions of Nevada, Nevis, and New Zealand, none of which has usury laws.[9] The following provision is illustrative:

> Governing Law: Lender and Borrower hereby stipulate and agree that this transaction is made pursuant to the laws of Nevis and that Nevis law shall control the rights, duties, and obligations of the parties hereto without regard[] to Nevis choice of law provisions.

*See, e.g.*, Supp. App'x 58; *see also* App'x 1535, 1947 (Nevada), 1932-33 (New Zealand).

Rejecting Moseley's request for an instruction that the jurors "must apply the usury law of the state or nation agreed upon in the lending agreement," App'x 62-63, the district court instructed the jury as to applicable interest rates only that, "In New York, the enforceable rate of interest on consumer loans is no more than 25 percent per year, and loans above that rate are unenforceable." App'x 1773.

We review "a claim of error in jury instructions *de novo*, reversing only where, viewing the charge as a whole, there was a prejudicial error." *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003). To evaluate Moseley's argument, we first ask whether the loan agreements included an effective choice-of-law provision; we

---

[9] *See, e.g.*, *Nev. Dep't of Bus. & Indus. v. Check City P'ship*, 337 P.3d 755, 756 (Nev. 2014) ("Nevada does not have a usury law, so there is no statutory cap on interest rates.").

14

conclude that they did not. Having discarded the contractual provisions, we then conduct a routine choice-of-law analysis and determine that New York usury law governs consumer loans made to the state's residents. We therefore find no error in the district court's challenged instruction.

*1.      The import of the loan agreements' choice-of-law provisions*

We must first assess whether, in the operative loan documents, the lender and borrowers agreed to an effective choice-of-law provision designating the jurisdiction whose law would govern their business relationship. Moseley agrees with the government that, as to New York borrowers, New York law governs the question whether the agreements' choice-of-law provision was effective.

We have described New York's general rule for assessing the effectiveness of contractual choice-of-law provisions as follows: "New York law is unambiguous in the area of express choice of law provisions in a contract. Absent fraud or violation of public policy, contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the transaction." *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996).[10] As to contracts that violate public policy, the New York Court of Appeals has accordingly explained that, "While parties are generally free to reach agreements on whatever terms they prefer, courts will not enforce [choice-of-law] agreements where the chosen law violates some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted

---

[10] We need not determine whether under New York law any of the three jurisdictions named in the choice-of-law provisions had "sufficient contacts with the transaction," *Int'l Minerals*, 96 F.3d at 592, because we conclude that the law of those places is unenforceable as a matter of public policy. One might reasonably wonder whether any of the three could pass the "sufficient contacts" test, but our public policy conclusion makes the inquiry superfluous.

15

tradition of the common weal." *Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364, 368 (2015); *see also Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 7 N.Y.3d 624, 627 (2006) (analyzing whether "New York's public policy against such contracts [that include provisions specifying that a subcontractor will not be paid unless the contractor has been paid] is so fundamental that it should override the parties' choice of law"). Further, courts are cautioned not to invoke this "public policy exception" lightly; rather, it should be "reserved for those foreign laws that are truly obnoxious." *Brown & Brown*, 25 N.Y.3d at 368.

To identify a fundamental New York public policy such as might overcome the parties' stated choice of law, we look to "the State's Constitution, statutes and judicial decisions." *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 202 (1985). Here, to begin with, the parties identify no provision of the New York Constitution as relevant to usury or lending practices. The New York legislature, however, has enacted both a civil usury statute, which prohibits charging usurious rates, *see* N.Y. Gen. Oblig. Law § 5-501, N.Y. Banking Law § 14-a(1), and a criminal usury statute, which makes it a felony to charge interest at a rate higher than 25 % per annum, *see* N.Y. Penal Law § 190.40. These are—at the least—a notable expression of the state's public policy.

Not long ago, we recounted some of the history of these usury laws and their enforcement:

> New York's usury prohibitions date back to the late 18th century. New York enacted the current cap—16 percent interest on short-term loans made by non-bank, unlicensed lenders—decades ago [in 1979]. . . . New York regulatory authorities, both at the behest of successive Attorneys General and now the Superintendent of Financial Services, have pursued businesses that lent money at interest rates above the legal limit.

16

*Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110-11 (2d Cir. 2014). These laws have long been on the statute books and, as observed in *Otoe-Missouria Tribe of Indians*, they appear to be well enforced. That New York regulates usury at all holds some significance, but its legislation of a felony usury offense strikes us as particularly persuasive in demonstrating that the New York legislature considers usury to be a matter of serious public concern.

New York judicial opinions have consistently recognized the state's prohibition of excessive interest rates as embodying a fundamental public policy. In 1977, the New York Court of Appeals analyzed the circumstances under which a closely held corporation (perhaps the surrogate for an individual borrower) may invoke usury as a defense in a suit for payment, notwithstanding the general preclusion found in N.Y. Gen. Oblig. Law § 5-521 for corporations taking this tack. In its discussion, the Court of Appeals reflected on the rationale behind New York's usury laws:

> The purpose of usury laws, from time immemorial, has been to protect desperately poor people from the consequences of their own desperation. Law-making authorities in almost all civilizations have recognized that the crush of financial burdens causes people to agree to almost any conditions of the lender and to consent to even the most improvident loans. Lenders, with the money, have all the leverage; borrowers, in dire need of money, have none. . . . [New York law] protect[s] impoverished debtors from improvident transactions drawn by lenders and brought on by dire personal financial stress.

*Schneider v. Phelps*, 41 N.Y.2d 238, 243 (1977).

Consonant with this view, New York state courts of first instance have universally agreed that the usury laws reflect an important public policy. *See Am. Exp. Travel Related Servs. Co. v. Assih*, 893 N.Y.S.2d 438, 446 (Civ. Ct. 2009) ("New York has a strong public policy against interest rates which are excessive and this is a policy the

courts must enforce."); *N. Am. Bank, Ltd. v. Schulman*, 474 N.Y.S.2d 383, 387 (Civ. Ct. 1984) ("This Court would find . . . that the policy underlying our state's usury laws is in fact of a fundamental nature."); *Guerin v. New York Life Ins. Co.*, 271 A.D. 110, 116 (1st Dep't 1946) ("Usury is a question of supervening public policy . . . ."). Moseley cites no New York state case law to the contrary.

As Moseley correctly notes, however, several federal district courts in New York faced with usury defenses have enforced choice-of-law provisions specifying non-New York jurisdictions. In every such case, however, the debtors were corporations—the antithesis of the type of needy and unsophisticated consumers both at issue here and of concern to the New York Court of Appeals in *Schneider v. Phelps*.[11] The distinction bore heavily in many of these seemingly contrary decisions. *See, e.g.*, *Walter E. Heller & Co. v. Chopp-Wincraft Printing Specialties, Inc.*, 587 F. Supp. 557, 560 (S.D.N.Y. 1982) ("Nor should Illinois' law be deemed violative of public policy, since usury is not a favored defense [in New York], particularly in the circumstances here where a corporation rather than a helpless consumer is involved."); *see also RMP Capital Corp. v. Bam Brokerage, Inc.*, 21 F. Supp. 3d 173, 186 (E.D.N.Y. 2014); *Superior Funding Corp. v. Big Apple Capital Corp.*, 738 F. Supp. 1468, 1471 (S.D.N.Y. 1990). Thus, these cases do not advance Moseley's argument. Moreover, we agree with these decisions that when courts determine whether New York would enforce choice-of-law provisions set out in

---

[11] By statute, New York circumscribes the availability of civil usury laws as a shield for corporations, which almost by definition are more sophisticated than consumers, and may be wealthier as well. *See* N.Y. Gen. Oblig. Law § 5-521(1) ("No corporation shall hereafter interpose the defense of usury in any action."). Even so, and consistent still with its public policy concern about usury, New York law permits corporations to raise a *criminal* usury defense. *See id.* § 5-521(3).

a contract, corporations conducting their business transactions should be treated differently from individual consumers seeking personal credit. *See Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 149-50 (S.D.N.Y. 2017) (because New York usury laws constitute "fundamental public policy," applying New York usury law to a consumer credit card agreement despite a choice-of-law provision specifying Delaware).

Accordingly, we identify a longstanding public policy in New York in favor of enforcing its usury laws to protect those of its residents who enter into consumer debt contracts. In consumer loan contracts, choice-of-law provisions specifying foreign jurisdictions without usury laws are unenforceable in New York as against its public policy.

2.      *Choosing applicable law in the absence of a choice-of-law provision*

If his contracts' choice-of-law provisions specifying Nevada, Nevis, and New Zealand law are unenforceable, Moseley offers an alternative to applying New York law in his loan transactions: he insists that under New York conflict-of-law rules, the usury law of *Missouri*, not New York, should govern. As discussed, New York criminal usury law sets a firm 25 % cap for unlicensed lenders; Missouri law is more lenient, allowing loans in conformance with the specifics set forth in the margin.[12] Missouri was not

---

[12] Missouri law is substantially less strict with lenders than is New York law. For all lenders making unsecured loans of $500 or less, Missouri law prohibits borrowers from being required to "pay a total amount of accumulated interest and fees in excess of seventy-five percent of the initial loan amount on any single loan . . . for the entire term of that loan and all renewals." Mo. Ann. Stat. §§ 408.500, 408.505(3). This prohibition thus allows lenders to require borrower payments of up to $175 on a $100 loan, regardless of the length of the loan term. The effect is to allow lenders to charge interest rates far above the New York caps. Even so, Missouri law

mentioned in the agreements, but Moseley's business operations were located there, and so he has a colorable argument that Missouri law applies, regardless of the borrowers' locations.

New York applies the so-called "center of gravity" approach to choice-of-law issues. Under this approach, "the courts . . . lay emphasis . . . upon the law of the place which has the most significant contacts with the matter in dispute." *Auten v. Auten*, 308 N.Y. 155, 160 (1954). In adjudicating the choice of law for a contract dispute, the New York Court of Appeals looks to "five generally significant contacts": "the place[s] of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties." *Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 227 (1993). "The traditional choice of law factors—the places of contracting and performance—are given heavy weight in this analysis." *Tri-State Emp. Servs., Inc. v. Mountbatten Sur. Co.*, 295 F.3d 256, 261 (2d Cir. 2002). As is particularly relevant here, public policy considerations such as those discussed above may also bear on the analysis in cases "where the policies underlying conflicting laws in a contract dispute . . . reflect strong governmental interests." *Matter of Allstate*, 81 N.Y.2d at 226.

In support of his claim for Missouri law, Moseley argues first that the so-called "rule of validation" should apply. This is a reference to our comment, in dictum drawn from a 1966 decision, that New York "seems to follow a special [choice-of-law] rule with regard to usury, applying the law of any state connected with the transaction which will validate it, to give effect to the parties' apparent intention to enter a lawful contract." *Speare v. Consol. Assets Corp.*, 367 F.2d 208, 211 (2d Cir. 1966). After we decided *Speare*,

would still disallow some (but not all) of the loans Moseley's business made, depending on how many times the borrower paid finance charges.

however, at least one New York appellate court disavowed adherence to such a rule and suggested persuasively that our observation misapprehended New York law. *A. Conner Gen. Contracting Inc. v. Rols Capital Co.*, 145 A.D.2d 452, 453 (2d Dep't 1988) (noting that "the Court of Appeals has not articulated a special rule for usury cases" and holding that the standard rule applies). We therefore disregard the dictum in *Speare* and follow *A. Conner* here as the most recent definitive statement of New York law.

Thus, applying the "center of gravity" test to determine, under New York law principles, which jurisdiction's law governs the loan agreement, we conclude that a New York court would find that New York usury law applies. We tally the contacts as follows:

The contacts with New York are provided by the New York domiciles of many borrowers and the subject matter of the contract: loans and payments that affected the borrowers individually in New York in a direct way.[13] The loan proceeds were received in New York and repaid from New York. In contrast, the contacts with Missouri are thin and were not evident to the borrowers, diminishing the weight to be accorded them. It is true that Moseley's business was located in Missouri, money flowed to and from Missouri, and Moseley's representatives were located in Missouri when they actually contacted consumers. The lending entities, however, were not incorporated in Missouri. Furthermore, even apart from the source of funds not being evident, borrowers had no way of knowing that Moseley's business was based in Missouri. In our estimation, a review of these contacts counsels for a conclusion that New York, not

---

[13] Since the contract was not negotiated, we do not consider the place of negotiation as a separate factor.

Missouri, was the "center of gravity" of the transaction and thus, in favor of applying New York law.

The question is even more definitively answered, in our view, by the strength of New York's public policy in protecting its low-income borrowers from being charged usurious rates. This is an "instance[] where the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests." *Matter of Allstate*, 81 N.Y.2d at 226. As reviewed in Part I(A)(1), above, New York maintains and acts on a strong public policy in favor of protecting indigent borrowers from "improvident transactions drawn by lenders and brought on by dire personal financial stress." *Schneider*, 41 N.Y.2d at 243. Considered in combination with the factors reviewed above, we rule that New York law applies to the transaction and that the district court was correct when it so instructed the jury.

B.   Fair warning

Moving on from choice of law, Moseley urges us next to rule that the government's reliance on RICO's "unlawful debt" provision violated the fair warning guarantee of the Due Process Clause. He contends that, in combination, the government's use of this RICO provision and the judicial determination that his contracts' choice-of-law clauses are unenforceable in New York was so unforeseeable as to violate fundamental notions of fairness, requiring us to invalidate his conviction.

The Supreme Court has identified "three related manifestations of the fair warning requirement," including, as relevant here, that "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997). The first use of a longstanding statute to prosecute

22

defendants engaged in a particular type of conduct—here, usurious payday loans—does not necessarily violate the Constitution, however. For the Constitution to disallow such an initial use, the construction of the statute that it depends on must be both "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964). Our Circuit has consistently found that a statute avoids running afoul of the "unexpected and indefensible" standard stated in *Bouie* when "the law give[s] sufficient warning that [people] may conduct themselves so as to avoid that which is forbidden, and thus [does] not lull the potential defendant into a false sense of security, giving him no reason even to suspect that his conduct might be within its scope." *Rubin v. Garvin*, 544 F.3d 461, 469 (2d Cir. 2008) (citing *United States v. Herrera*, 584 F.2d 1137, 1149 (2d Cir. 1978)).

The "unlawful debt" provisions of RICO are straightforward and neatly apply here. *See* 18 U.S.C. §§ 1962(c), 1961(6). Further, the unenforceability in New York of the Nevada, Nevis, and New Zealand contractual choice-of-law provisions, as discussed above, was foreseeable: such a provision clearly violates New York public policy. Moseley cites no reasonably persuasive authority that would have given him reason to believe that his loans were not "unlawful debts" under RICO. While he points to federal cases upholding choice-of-law provisions for corporations in the usury context, he identifies no precedent favorable to his position in the context of a consumer transaction, where the core policy behind usury laws squarely applies. Accordingly, we see no basis to conclude that Moseley was somehow "lull[ed] . . . into a false sense of security" or had "no reason even to suspect that his conduct might be within [RICO's] scope." *Rubin*, 544 F.3d at 469. His arguments that his prosecution offended the Constitution fail to persuade.

C.      Mental state for RICO counts

In a more general attack on the RICO verdicts, Moseley maintains that the record
contains insufficient evidence to support the jury's conclusion that he had the mental
state that we assume to be required to support the jury's guilty verdict: that is, that he
was aware of the unlawful nature of the loans. He provided uncontradicted exculpatory
evidence that he relied in good faith on the advice of counsel, he submits, and thus he
did not have specific intent to violate the law.

A defendant challenging the sufficiency of the evidence after a conviction by jury
"bears a heavy burden." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013). On such
an appeal, we review the record evidence "in the light most favorable to the
government." *United States v. George*, 779 F.3d 113, 115 (2d Cir. 2015). The standard is
well established that we must affirm if "*any* rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S.
307, 319 (1979) (emphasis in original).

On review, we have no trouble locating record evidence that provided a rational
basis for a jury to find that Moseley was aware of the unlawful nature of his loans. At
trial, Moseley admitted that he knew that he was lending at rates more than twice the
rate allowed in New York.[14] He further acknowledged that he incorporated lending

---

[14] On cross-examination, Moseley answered as follows:

> Q. Sir, you knew you were lending in excess of the usury laws of New York
> State, right?
> A. Yes.

24

entities abroad to attempt to avoid the strictures of state usury laws. *See* App'x 1428-30. Other evidence showed that Moseley received numerous complaints from state attorneys general, including the New York State Attorney General, informing him that he was lending in violation of state laws that applied regardless of the lending entity's jurisdiction of incorporation. *See* Supp. App'x 131 (New York State Attorney General letter dated March 5, 2013, advising, "Please note that New York State's usury and licensing laws apply to foreign entities lending to individuals in the state."). Furthermore, the record reflects that, to evade regulatory action in certain states, Moseley stopped making loans through those of his lending entities that had come under scrutiny by state attorneys general, while continuing to lend through those that were not under scrutiny. Finally, the record shows—in tension with his advice-of-counsel defense—that one of his attorneys warned Moseley, "[Y]our business model carries substantial risk and is one that we would not have recommended." App'x 1574. This evidence and evidence like it provided ample basis for the jury to disbelieve Moseley when he purported not to know that his scheme was unlawful.

We therefore reject Moseley's sufficiency challenge to the scienter element of the offense.

## II.    TILA Counts

Turning to Moseley's conviction for violating the Truth in Lending Act, 15 U.S.C. § 1611, and related regulations: Moseley assails this conviction, too, on sufficiency

---

Q. You knew that you were charging more than double the limits of New York, right?
A. Yes.

App'x 1424.

25

grounds. To convict on a criminal TILA violation, the jury must find that the defendant, "willfully and knowingly," has "give[n] false or inaccurate information or fail[ed] to provide information which he [was] required to disclose." 15 U.S.C. § 1611(1).

Here, the operative indictment focused on Moseley's business's allegedly inaccurate "total of payments" disclosures to their borrowers. The TILA requires lenders to make various disclosures for all one-time loans. These include the following:

> (5) The sum of the amount financed and the finance charge, which shall be termed the "total of payments".
> (6) The number, amount, and due dates or period of payments scheduled to repay the total of payments.

15 U.S.C. § 1638(a)(5)-(6). The related regulations add more detail, linking the "payment schedule" and the "total of payments" disclosures as follows:

> (g) Payment schedule. . . . [Defined as:] [T]he number, amounts, and timing of payments scheduled to repay the obligation.
>     . . . .
> (h) Total of payments. The total of payments, using that term, and a descriptive explanation such as "the amount you will have paid when you have made all scheduled payments."

12 C.F.R. § 226.18(g)-(h). Both the statute and the implementing regulations focus on the lender's obligation to disclose the "payment schedule." In addition, the regulations tie the "total of payments" disclosure and the scheduled payments concept together by requiring, as part of the "total of payments" disclosure, a "descriptive explanation such as 'the amount you will have paid when you have made all scheduled payments.'" *Id.* Considering this language, we understand the "total of payments" disclosure to require display of the total dollar amount of the scheduled payments: principal plus the aggregate interest or fee.

Moseley insists that his loan disclosures were accurate and fully in compliance with both statute and regulations. Once again, however, the record contains substantial evidence to the contrary and in support of the jury's guilty verdict: it shows that, on the typical Moseley loan document, the "total of payments" disclosure included just one finance charge in addition to the loan principal amount. This choice of display was made notwithstanding Moseley's knowledge (and in fact, his intention) that, unless the borrower acted, the total she would pay would amount to much more than a single finance charge, and that the "total of payments" had no upper limit at all except those arbitrarily imposed by Moseley's business, such as 40 or 45 charges.

TILA-compliant disclosures must reveal the "total of payments" under the payment schedule set *at the time of the loan disbursement*—not under an illusory payment schedule achievable only after the borrower undertakes steps described in fine print. This understanding is consistent with the regulations' requirement that the "total of payments" should disclose "the amount you will have paid when you have made all *scheduled* payments." 12 C.F.R. § 226.18(h) (emphasis added). Thus, a jury could rationally have found that Moseley's "total of payments" disclosure of just the loan principal plus one finance charge—despite the fact that no such payment was actually scheduled—was inaccurate and misleading.

Moseley insists that he could not have provided an accurate disclosure because there was no way to know what a borrower's "total of payments" would be. He argues that, because subsequent events would control the ultimate total paid, his disclosure was as accurate as he could make it, and points to 12 C.F.R. § 226.5(e) as anticipating this fluid and unpredictable situation. Section 226.5(e) provides: "If a disclosure becomes inaccurate because of an event that occurs after the creditor mails or delivers

the disclosures, the resulting inaccuracy is not a violation of this regulation . . . ." Moseley's disclosure was already inaccurate at the time of the initial disbursement, however, as already discussed, and section 226.5(e) is therefore inapplicable here. Furthermore, the fact that the "total of payments" amount may be difficult to predict and will vary borrower to borrower does not somehow exempt Moseley from the obligation to disclose the potentially limitless "scheduled" amount. He could have advised borrowers accordingly.

We therefore conclude that adequate evidence supported the jury's guilty verdict under TILA.

## III.   Other Issues

Moseley offers a collection of additional arguments that challenge the sustainability of the district court proceedings. We identify no basis in them for disturbing the result reached.

### A.   Admission into evidence of borrower complaints

First, Moseley charges error in the district court's decision to allow the verbatim introduction of borrower complaints about Moseley's business. He argues that (1) they should have been excluded as hearsay under Fed. R. Evid. 801(c) and 802, (2) they were testimonial and their introduction violated his Sixth Amendment Confrontation Clause rights, and (3) they should have been excluded as unfairly prejudicial or cumulative under Fed. R. Evid. 403.

We review evidentiary rulings for clear abuse of discretion, requiring a showing of "manifest error" before we will consider taking any further action on appeal. *Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010).

The familiar prohibition on hearsay statements addresses statements that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Evidence of customer complaints may be introduced to show the defendant's culpable state of mind, however, and when so used, they are not considered "to prove the truth of the matter asserted in the statement." *Id.* "[A] statement is not hearsay where . . . it is offered, not for its truth, but to show that a listener was put on notice" of illegal acts. *United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013). Applying this rationale, we have specifically held that "evidence that there had been complaints which were called to [the defendant's] attention was relevant on the issue of [the defendant's] intent." *United States v. Press*, 336 F.2d 1003, 1011 (2d Cir. 1964). Here, borrower complaints about illegal practices by Moseley's business served to put Moseley on notice of their potential illegality. That he continued to operate his business despite this notice makes the complaints probative of his intent to violate the law. Furthermore, any impermissible effect was addressed by the district court's appropriate limiting instruction, which directed the jury to consider the complaints only for purposes of assessing Moseley's state of mind.

As to Moseley's Sixth Amendment Confrontation Clause argument arising from his inability to cross-examine the complaining borrowers: The purpose of the Confrontation Clause is "to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial." *Michigan v. Bryant*, 562 U.S. 344, 358 (2011). The Confrontation Clause applies only when the evidence is "testimonial," and while courts debate the precise contours of the term "testimonial," the complaints at issue here do not present a borderline case. *See Crawford v. Washington*, 541 U.S. 36, 50-52 (2004) (listing definitions). Borrowers complained

29

intending to seek relief from the onerous terms of Moseley's loans—not to provide evidence for eventual use in Moseley's prosecution.

Finally, Moseley urges that the introduction of the full texts of borrower complaints, including potentially emotional details about the hardships brought on by Moseley's schemes, resulted in their probative value being outweighed by their prejudicial effect. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ."). We recognize that the government could have demonstrated the fact of borrower complaints without introducing the complaints themselves verbatim, *see Press*, 336 F.2d at 1011 (the prosecution introduced just "evidence that complaints had been received"), but we do not identify a clear abuse of discretion in the district court's decision. The court observed that borrower witnesses would testify at trial to anguish expressed in their written complaints, and indeed, five borrower witnesses did, ultimately, testify at trial. Moseley did not object to the witness testimony. Although this issue presents a closer call than do Moseley's other evidentiary arguments, we agree that prejudice caused by introduction of the written complaints themselves was only marginal in these circumstances. We therefore defer to the district court's determination that this prejudice did not "substantially outweigh[]" the complaints' significant probative value in assessing Moseley's intent. Fed. R. Evid. 403. We perceive no abuse of discretion in the district court's decision to allow introduction of the complaints.

B.     Sentencing: procedural unreasonableness

As to his sentence, Moseley attacks it as procedurally unreasonable. He purports to identify error in the district court's determination, as part of calculating the

30

applicable United States Sentencing Guidelines range, that overall Moseley caused borrowers nationwide a loss of $49 million.

Under U.S.S.G. § 2B1.1, the sentencing court increases the defendant's offense level based on the "loss" to victims caused by his acts. *See* U.S.S.G. § 2B1.1(b)(1). Here, the district court increased Moseley's offense level by 22 points based on its valuation of the related loss at more than $25 million, but less than $65 million. *Id.* § 2B1.1(b)(1)(L)-(M). The result was a total offense level of 43. Combining this offense level with a criminal history category of I produced a Guidelines incarceration sentence of a life term. This result was modified by the district court's determination that the statutory maximum sentence was 996 months, or 83 years—also in effect a life sentence for any adult. At sentencing, the district court downwardly departed from the Guidelines, taking account of the statutory maximum, and ultimately sentenced Moseley to 120 months in prison.

Notwithstanding the court's significant departure in Moseley's favor, we review the Guidelines calculation for error because the district court may have selected a different sentence had it started in the context of a different Guidelines range. *See United States v. Elefant*, 999 F.2d 674, 678 (2d Cir. 1993) ("[A] departure does not insulate an error in the calculation of the guideline range from which the departure is made, unless the District Court specifically states that it would have departed to the same level regardless of whether it had accepted the defendant's guideline arguments."). Under the Guidelines, the relevant loss amount must be established by a preponderance of the evidence; we review such a calculation for clear error. *See United States v. Brennan*, 395 F.3d 59, 74 (2d Cir. 2005). The "Guidelines do not require that the sentencing court

31

calculate the amount of loss with certainty or precision." *United States v. Bryant*, 128 F.3d 74, 75 (2d Cir. 1997).

We find no error in the district court's calculation. The district court arrived at a loss estimate of $49 million based on two factors: (1) Moseley's business netted $69 million in profits during the relevant time period, and (2) an employee estimated under oath that borrower authorization was obtained in only 30 % of loans. The court estimated a $49 million cumulative loss to borrowers by taking 70 % of $69 million, representing money obtained from borrowers who did not authorize loans.

Moseley assails this calculation technique as too crude in its assumptions. The Guidelines commentary provides, however, that "[t]he estimate of the loss shall be based on available information." U.S.S.G. 2B1.1 cmt. n.3(C). The calculation performed here was made in accordance with this standard using the evidence—admittedly limited—that was available.

Moseley also contends that, for purposes of calculating the loss amount, only the borrowers who complained to Moseley's business about non-authorization of a loan should be deemed to have been defrauded. The district court reached too far, he implies, by including as "loss" funds derived from all borrowers who were not contacted via phone. We reject this argument. Moseley cites no evidence in the record to suggest that his business used a mechanism for obtaining loan authorization other than telephone contact. It was therefore correct of the district court to treat 70 % of the loans as unauthorized. That a borrower may have never objected to the loan does not mean that the process that led to it was free of fraudulent representations or that those borrowers were not defrauded in the process.

We therefore identify no error in the district court's calculation of the applicable loss amount or in its determination of Moseley's Guidelines range.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.